UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| HAROLD V. GASKILL III, M.D. and HAROLD V. GASKILL III, M.D., P.A. | § § § § | |
| Plaintiffs | § § | |
| V. | § § | CASE NO. 5:13-cv-00665 |
| VHS  SAN ANTONIO PARTNERS, LLC, D/B/A BAPTIST HEALTH SYSTEM and D/B/A NORTH CENTRAL BAPTIST HOSPITAL, BAPTIST HEALTH SYSTEM, NORTH CENTRAL BAPTIST HOSPITAL GRAHAM REEVE, DAVID SIEGEL, WILLIAM WAECHTER and JAYDEEP SHAH | § § § § § § § § § § § § | **Complaint and Jury Demand** |
| Defendants | § | |

## PLAINTIFFS' ORIGINAL PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, Harold V. Gaskill III and Harold V. Gaskill III, M.D., P.A., Plaintiffs in the above styled and numbered cause, and files this, Plaintiffs' Original Petition, complaining of Defendants, VHS San Antonio Partners, LLC d/b/a Baptist Health System and d/b/a North Central Baptist Hospital, Baptist Health System, North Central Baptist Hospital, Graham Reeve, David Siegel, William Waechter and Jaydeep Shah  and for causes of action would show as follows:

1

## I.  Parties

1.      Plaintiff, Harold V. Gaskill III (Gaskill), is a natural person, residing in San Antonio, Bexar County, Texas at 208 Hunter's Branch South Street, 78231.

2.      Plaintiff, Harold V. Gaskill III M.D., P.A. (PA), is a professional association, formed and operating under the laws of the State of Texas with its offices in San Antonio, Bexar County, Texas at 540 Oak Centre, Suite 280, San Antonio, Texas 78258.

3.      Defendant VHS Partners, LLC (VHS) d/b/a Baptist Health System (BHS) and d/b/a North Central Baptist Hospital  (NCB) is a Delaware Corporation, with its office and principal place of business at 20 Burton Hills Boulevard, Ste. 100, Nashville, TN 37215. VHS owns and operates BHS and NCB in San Antonio, Texas.  It can be served with process by serving its registered agent for service of process National Registered Agents, Inc. 350 N. St. Paul Street, Suite 2900 Dallas, TX 75201-4234. As set out herein above, VHS through its dba's and their peer-review committees has entered into and breach contracts and/or committed torts in the state of Texas directly connected to this lawsuit.  As such VHS has sufficient related and unrelated minimum contacts to make it amenable to the jurisdiction of Texas courts.  This Court therefore has personal jurisdiction of Defendant VHS.

4.      Defendant Baptist Health System (BHS) is a an assumed name of VHS  and the entity that oversees all of the VHS hospitals including North Central Baptist Hospital owned and operated by VHS and located at One Lexington Medical Building 215 East Quincy, Suite 200,San Antonio, Texas 78215 and it may be served by serving its chief

executive officer, Graham Reeve at Baptist Health System One Lexington Medical Building 215 East Quincy, Suite 200, San Antonio, Texas 78215. This Court therefore has personal jurisdiction of Defendant BHS.

5.      Defendant North Central Baptist Hospital (NCB) is a hospital owned and operated by Defendant VHS located at 520 Madison Oak Dr., San Antonio, TX 78258.  It may be served with process by serving its President William Waechter at One Lexington Medical Building 215 East Quincy, Suite 200, San Antonio, Texas 78215. This Court therefore has personal jurisdiction of Defendant NCB.

6.      Defendant Graham Reeve, is the Senior Vice-President of Operations for VHS San Antonio Partners, LLC, President and Chief Executive Officer of the Baptist Health System, President and Senior-Vice President of Operations for BHS Specialty Network, Inc., and President and Chief Executive Officer, of BHS Physician's Network, Inc., with a business address of One Lexington, 215 East Quincy, Suite 200, San Antonio, TX 78205. He can be served with process at One Lexington, 215 East Quincy, Suite 200, San Antonio, TX 78205. This Court therefore has personal jurisdiction of Defendant Reeve.

7.      Defendant William Waechter is the President, North Central Baptist Hospital, with a business address of One Lexington, 215 East Quincy, Suite 200, San Antonio, TX 78205. He may be served with process at One Lexington Medical Building 215 East Quincy, Suite 200, San Antonio, Texas 78215.  This Court therefore has personal jurisdiction of Defendant Waechter.

3

8.    Defendant David Siegel, MD is the Chief Medical Officer, Baptist Health System with a business address of One Lexington, Suite 200, San Antonio, TX 78205. He may be served with process at One Lexington Medical Building 215 East Quincy, Suite 200, San Antonio, Texas 78215.   This Court therefore has personal jurisdiction of Defendant Siegel.

9.    Defendant Jaydeep Shah is the Chair of the Medical Staff Quality/Peer-review Committee, North Central Baptist Hospital, Director of Anesthesia, Baptist Health System, and Director of Perioperative Services, Baptist Health System with a business address of One Lexington, 215 East Quincy, Suite 200, San Antonio, TX, 78205.   He may be served with process at One Lexington Medical Building 215 East Quincy, Suite 200, San Antonio, Texas 78215.   This Court therefore has personal jurisdiction of Defendant Shah.

## II. Jurisdiction and Venue

10.    This Court has jurisdiction pursuant to 28 USC §1332 in that this suit is based upon violations of the Health Care Quality Improvement Act of 1986, 42 USC §11101-11152 (hereinafter HCQIA) that resulted from bad faith peer-review.  It includes state pendant claims for breach of contract, defamation, business disparagement, and intentional infliction of emotional distress.

## III. Statement of Facts

11.    The individual Defendants are all physicians and or persons, working for Defendants Baptist Health Systems and/or North Central Baptist Hospital and residing in Bexar County, San Antonio, Texas.   They are either members of the North Central

4

Baptist Hospital Medical Executive Committee and/or the North Central Quality Peer-review Committees in the case of Defendant Shah, or in the case of Reeve and Waechter, have positions of authority at BHS or CBH that requires them to oversee these committees and to participate in the decision making process of the peer-review and/or medical executive committee. Defendant Siegel is chief medical officer of BHS and likewise is involved in the decision making process of the NCB Medical Executive Committee and Peer-review Committee.

12.     This is a claim for bad faith peer-review under the HCQIA of 1986 and for monetary damages that flow therefrom when the Defendants' conduct is such that they are afforded no immunity for their actions.  Plaintiff Gaskill is a surgeon specializing in general surgery.  He had a contractual relationship with Defendant BHS at its North Central Baptist hospital facility under a written agreement that provided him with surgical privileges at the hospital.  On February 20, 2010 Gaskill operated on a patient (Patient X) for acute cholecystitis.  In the course of the operation, the patient suffered an unintended injury to the small bowel.  Patient X was a 19 year-old female. Having detected the possible problem, Gaskill evaluated the patient and was planning to return Patient X to the operating room about 48 hours post-operatively.  Unfortunately, her mother, a licensed ICU nurse, did not want him to do so as she did not seem "sick enough" and convinced her daughter to refuse operation.  Gaskill was able to convince the patient and her mother to return to the operating room several days later.  The problem was located and repaired, and although Patient X had a complicated recovery, she left eventually left the hospital doing well.

5

13.    Bowel injuries are a known complication of the type of surgery performed on Patient X.  Gaskill did not believe he had deviated from the standard of care managing this complication.  Almost six months later, the Quality Care/Peer-review Committee, of which the individual Defendants are members, reviewed the case of Patient X, and on August 2, 2010 recommended a focused review of Gaskill's next 50 cases.  Thereafter, Gaskill heard nothing from Defendants or others about the surgery, Patient X, or any case review.

14.    On December 2, 2011 Gaskill met with Defendant Shah, Chair, Medical Staff Quality/Peer-review Committee, North Central Baptist Hospital, Dr. Lee Rodgers, Chief Medical Officer, North Central Baptist Hospital, and Defendant Waechter, CEO, North Central Baptist Hospital to discuss quality of care issues regarding a patient on which he operated on February 27, 2011 (Patient Y).  This case is identified as MR# ending in 3191 in the outside review that would be conducted and become part of the factual allegations in this suit.

15.    On December 7, 2011 Gaskill received a letter from Defendant Shah, on behalf of Defendants, stating that he could not take call or accept or treat any new patients.  The letter included statements about issues that were not addressed in the meeting and included boilerplate language from the medical staff by-laws regarding peer-review.  It was clear that without formally saying so Defendants were initiating a peer-review process.  On December 9, 2011, Gaskill responded to Defendant Shah's letter of December 7, 2012, pointing out the inaccuracies in his letter and questioning the decision.  There had been no investigation into the care of Patient Y, and Gaskill was

6

never presented with any documentation or evidence that a suspension of his privileges was appropriate.   Despite having almost ten months to have investigated the care of Patient Y, Defendants presented nothing to indicate that their decision to suspend Gaskill's privileges was:

a.  In the furtherance of quality health care.  There was no evidence of any kind provided that the actions of Defendants was taken to restrict incompetent behavior or would protect patients;

b.  Without any opportunity, reasonable or otherwise to obtain the facts.  In short the review process was deficient of any effort to discern what had transpired with Patient X;

c.  Without any effort to thereafter conduct any investigation, and more important to offer any hearing procedures as provided for in the hospital by-laws

In fact, the letter implementing the so-called "agreed suspension" refers simply to a "recent case…and several other quality issues including professionalism."  There were no specifics and nothing that would support a suspension of any privileges based on quality of health care or the need to restrict incompetent behavior.  Furthermore, in the meeting of December 2, 2011, Defendant Shah raised the issue of a temporary suspension and indicated it needed to be "agreed."  Gaskill immediately indicated he was opposed to such an action and inquired as to what would happen if he refused to agree.  He was told that if he did not agree, the committee (including the individual Defendants) would impose an involuntary suspension and report that fact to the publicly available National Practitioner Data Base.

16.    For the next six months Defendants kept Gaskill on suspension despite telling him he was not "under investigation."  His suspension was allegedly "voluntary," but was implemented with the understanding that he had no real choice.  There was no 30-day review, and without any indication of how he was a threat to continued patient safety, there was no evidence that his suspension was precautionary as defined in the by-laws.  In fact, any argument that it was precautionary would seem entirely unsupportable in light of the fact that the case of Patient Y that gave rise to the suspension occurred almost ten months before the suspension.  When the suspension began to approach 90 days Gaskill took steps to try to regain his ability to perform surgery.  On or about February 24, 2012, in an effort to resolve the impasse and move on, Gaskill offered to resign his privileges with the understanding that such an investigation would not be a reportable event to either the National Practitioner Data Bank or the Texas Medical Board.  The conduct of Defendants VHS, BHS, CBH and he individual Defendants had put Gaskill in a position of being unable to operate where he currently had privileges and being unable to resume his practice with those privileges under an indefinite suspension. There was no justifiable abeyance of any due process rights granted under Defendants' BHS and/or CBH by-laws or the HCQIA.  By forcing Gaskill into an agreed suspension, Defendants in effect took away his privileges and blocked any procedural avenue of relief by delaying any formal action that would trigger a peer-review process.  The individual Defendants claimed to have met in committee to review Gaskill's cases, but subsequently Gaskill has discovered, based on all of the information provided to him, that Defendants never conducted a meaningful and accurate investigation of any kind.

8

17.    On or about March 9, 2012 Gaskill received a letter from the North Central Baptist Hospital Medical Staff Quality/Peer-review Committee containing an "official summary" of past and present proceedings…" The letter notified Gaskill that the final date to respond in writing to the Peer-review Committee "summary comments" was March 23, 2012. Gaskill immediately responded, objecting to the two-week deadline and indicating that he had never received the original "peer-review investigation report." He would never receive a copy of the peer-review findings.

18.    From March 9, 2012 until June 1, 2012 Gaskill tried to restore his privileges as Defendants continued to maintain the suspension while refusing to provide any concrete proof for the basis of the suspension. On June 1, 2012, Defendants finally issued a "Notice of Involuntary Reduction of Medical Staff Privileges." The letter was authored and signed by Defendant Graham Reeve as president and CEO of BHS and purported to officially and involuntarily restrict Gaskill's privileges. Again, there were no specifics of what formed the basis of the decision. The notice on its face failed to demonstrate that there were any quality health care issues or that any of Defendants' actions were predicated on a need to prohibit or restrict incompetent behavior. It merely recited that the Medical Executive Board of Defendants BHS and CBH had approved the NCB medical committee and quality committee recommendations.

19.    On June 29, 2012 Gaskill, acting through legal counsel, made a formal request for a hearing pursuant to Defendant BHS's by-laws. Twelve days later, seemingly in response to his efforts to invoke his peer-review rights, Gaskill received a notice of complaint from the Texas Medical Board regarding a one-patient case wherein

it was alleged that on September 20, 2011 he induced and intimidated a patient into having a surgical procedure to remove a bowel obstruction.  Based on the timing of the complaint and circumstantial evidence Gaskill suspects Defendants were responsible for inciting the complaint.  Almost a month from the date of the complaint, the TMB dismissed the complaint as having never been filed because the TMB investigation showed that in every respect Gaskill met the standard of care.

20.    In order to enjoy immunity from monetary damages or personal suit, the HCQIA not only requires the hospital and its peer-review committee members to act objectively to preserve the quality of care and restrict incompetence, but also that the peer-review entity complies with basic notice and hearing procedures.  Once Gaskill put Defendants on notice of his intent to pursue a hearing as provided for in the by-laws, Defendants delayed setting a hearing date.   With Gaskill's suspension and his corresponding inability to perform surgical procedures now approaching 10 months, on September 27, 2012, Defendants finally set a hearing for October 12, 2012.

21.    The Notice of Hearing (the Notice) was defective from the outset.  Under section 2.5.4 of Defendant BHS's by-laws, the Notice completely failed to provide Gaskill any basis as to why the peer committee acted as it did.  Section 2.5.4 provides in part that the Notice shall include: "A statement of the specific reasons for the recommendation as well as the list of patient records and/or information supporting the recommendation."  The Notice sent to Gaskill had no specifics whatsoever and despite allegedly being based on patient records contained no documentation of any kind.  The by-laws allowed the Notice to be supplemented and/or amended, but at no time did

10

Defendant ever provide the specific allegations required for the Notice.  In addition, section 2.6 of the by-laws required Defendant BHS to provide a witness list within 15 days of the hearing containing the names and addresses of all individuals expected to offer testimony in support of the committee's recommendations.  Given the way the hearing was set, that provision required Defendants to provide Gaskill with a witness list at the time of the notice of hearing.  They did not do so.  While the existing law puts less emphasis on a violation of hospital by-laws, in this case the by-laws and failure to follow them demonstrate an objective deficiency in basic hearing procedural due process that is required by the HCQIA.

22.    Any effort to provide Gaskill with a meaningful peer-review process disintegrated with Defendants' unwillingness or inability to comply with its own by-laws or otherwise provide basic procedural due process.  Unable to obtain any coherent explanation of why he had been suspended and/or the basis of the June 1, 2012 Notice of Involuntary Reduction of Privileges, Gaskill and his legal counsel pushed for mediation in the hope of either resolving the impasse or at least discerning the underlying basis of the suspension and subsequent disciplinary action.

23.    The mediation process yielded an agreement to submit Gaskill's surgical cases to an outside reviewer who practiced in the Gaskill's field of expertise upon which Defendants relied in the first suspension of Gaskill in December 2011, the so-called "agreed suspension," and thereafter in seeking to permanently terminate his privileges on June 1, 2012.  The review process involved five cases, one of which was the February 27, 2011 case used in December 2011 to suspend Gaskill (Patient Y).  The mediation process

revealed that Defendants had never performed any kind of objectively adequate investigation into Gaskill's cases either before or after his suspension.  Defendants still refused to explain how these cases supported the suspension or any of the committees' actions in threatening to take away his privileges on a permanent basis.  Gaskill had long suspected that none of the cases at issue had ever been reviewed by a physician in his field or any other person with the necessary expertise to determine if the quality of care met or exceeded the standard.  His suspicions were based on his own expertise and the only information as to any pre-2013 review that was ever shared with him or his counsel.

24.    The March 9, 2012 letter from Defendant BHS to Gaskill contained "excerpts" from the so-called "peer-review."   To this day Gaskill has never been provided with the entire document, although it is documented that he asked for it repeatedly.  Any physician in Gaskill's field, or any general physician for that matter, can look at the excerpts from the alleged "peer-review" and readily ascertain that it was not the work product of a general surgeon and probably not even that of an MD or DO. The alleged "peer-review" is so professionally deficient that it appears to have been prepared by one of the non-MD staff working for the hospital. For example, if one looks at the case listed as number 3 on the March 9, 2012 letter, the reviewer states that "He had NO stones" and "Pathology showed only minimal chronic cholecystitis." In fact, the pathology report includes:

FINAL PATHOLOGICAL DIAGNOSIS:

GALLBLADDER.  CHOLECYSTECTOMY:

MILD CHRONIC CALCULOUS CHOLECYSTITIS.

The reviewer appears to have intentionally removed the word "calculus" from the final diagnosis. Calculus is the medical term for "stones." Any general surgeon would have known this fact, and yet Defendants allowed this review to form the basis of its continued bad faith peer-review of Gaskill. This report was then provided to all Defendants who almost certainly did not revisit the actual medical records. The inescapable conclusion is that the suspension of Gaskill's privileges from December 7, 2011 to June 3, 2013 was based on a sham "peer-review" performed by a non-MD or DO or even a general surgeon. This point is important because it demonstrates that Defendants, despite over two years between at least two of the reviewed cases and the mediation, had never attempted a meaningful investigation of the cases.[1]

25.    Gaskill and Defendants agreed that five cases would be sent out to an outside reviewer for evaluation. The firm MD Review was one of three firms proposed by the Baptist Health System and Dr. Gaskill agreed to have his cases submitted to that firm for independent peer-review. Mark Sherman, MD was assigned to review the cases by MD Review and he evaluated all five cases. His findings completely undermine any notion that Defendants acted consistent with the provisions of the HCQIA. Dr. Sherman found absolutely no deviation whatsoever from the standard of care. He undertook his investigation on or about January 30, 2013 and had reviewed every file by no later than March 7, 2013. There was not one finding in any patient reviewed that would support the

---

[1] There were five cases in total reviewed, two of which were over 24 months old when Dr. Sherman finished his review. Patient Y also identified as MR# ending in 3191 underwent surgery on February 27, 2011. A second patient underwent surgery on January 19, 2011. The remaining three cases were done between February and September 2011.

13

position that when Shah, Rogers, and Waechter acted on December 7, 2011 to suspend Gaskill's privileges that there was any effort to:

a.      Act in furtherance of quality health care, and no indication that their actions were taken to restrict incompetent behavior or would protect patients; or

b.      Conduct any type of investigation.  Correspondence indicates that Defendants supposedly reviewed Gaskill's cases in January, February, and March of 2012, but Sherman's findings in 2013 cast considerable doubt on any effort made to legitimately investigate the underlying facts.

26.     The failure to act with the appropriate objective motive and the lack of any investigation combined with the complete lack of basic procedural due process in the hearing stage virtually eliminate any notion that Defendants are afforded immunity from monetary suit under the HCQIA.

27.     While Defendants held Gaskill in a state of professional suspended animation, his medical career slowly dissolved.  In addition to having privileges at North Central Baptist Hospital, Gaskill also enjoyed the opportunity afforded by those privileges to work locum tenens at other hospitals throughout Texas.  His ability to work at those facilities was completely cut-off by the actions taken by Defendants at North Central Baptist.  After June 1, 2012, when the peer-review committee finally took official action, any locum tenens at another facility required Gaskill to disclose the North Central Baptist Hospital action, which eliminated any locum tenens work.  Beyond Gaskill's employment as a surgeon, he also developed a strong practice as a testifying medical expert.  A key component of that practice required him to have active surgical privileges

14

and an unimpeachable reputation in front of a jury, and Defendants severely damaged this aspect of his professional life.

28.    The locum tenens aspect of Gaskill's practice was expected to provide all of Dr. Gaskill's practice income going forward.  The actions of Defendants prior to Gaskill's suspension had already begun to severely diminish his income from that facility.  In 2005, Gaskill began to build his practice around in-network cases, but opted to draw his clientele almost exclusively from emergency room (ER) calls and the consultations and operations that resulted from being on the North Central Baptist Hospital general surgery call schedule.  Prior to 2010, the hospital did not reimburse for ER call or operating on unfunded patients.  However, in cases where the ER patient was insured Gaskill could nevertheless earn a significant income due in great part because few doctors wanted to take call and the volume of patients was high.  However, building a practice around ER calls also exposed a doctor to the possibility of cases that did not pay at all because the patient was uninsured.  At the time Gaskill decided to concentrate on ER cases he was the Chief of General Surgery at North Central Baptist Hospital and was able accept call if other doctors declined and could fill in when needed.  By 2010-2011 Gaskill's practice was built around complex, higher risk, non-elective ER cases.

29.    Gaskill's business model began to create problems between himself and Defendant BHS.  Ethically, Gaskill believed and continues to believe that a patient's ability to pay or the quality and/or existence of his or her insurance should not dictate the quality of the medical care they receive.  As a result, Gaskill treated uninsured patients with the same degree of care as those who were insured.  This philosophy ran head-on

15

into an unwritten, but well-known policy within Defendant BHS that ER cases were to be given a "band aid" and sent home if the patient was uninsured. Gaskill refused to do so, and two of the five cases reviewed by Dr. Sherman and that formed the basis of Defendants' actions against him were uninsured patients whose surgeries and post-operative care ran into the hundreds of thousands of dollars in costs to Defendant BHS. Thus, not only was Gaskill's willingness to treat the uninsured costing Defendant BHS money, but also by focusing on ER cases only, he was not bringing in income from private admissions, which were generally always insured.[2]

30. Gradually Defendant BHS began to eliminate Gaskill's ability to earn a living on ER cases. First, it began to pay Medicare rates for ER services which motivated doctors who were previously unwilling to take ER cases to begin to do so thereby taking business away from Gaskill. Second, Gaskill lost his position as Chief of General Surgery at North Central Baptist Hospital and with that position the ability to be available

---

[2] Significantly, the family of Patient Y was very pleased with Gaskill's care of their family member. In fact, they were of the opinion that Gaskill was the only physician caring for Patient Y that was actually concerned about his welfare. Accordingly, they requested that no changes be made in Patient Y's care or procedures performed on Patient Y without consulting Gaskill. Tragically, Patient Y was evicted from the North Central Baptist Hospital Intensive Care Unit onto the street in less than 24 hours on orders from one of North Central Baptist Hospital's employed physicians. This occurred despite a family member standing at the nurse's station pleading with the doctor not to send Patient Y out of the hospital. Gaskill was not notified of the eviction. Patient Y deteriorated rapidly at home and was transported by ambulance to University Hospital where he was admitted directly into their Intensive Care Unit less than 24 hours after his eviction from the North Central Baptist Hospital Intensive Care Unit. As far as can be determined there was never any formal review of this readmission within 24 hours despite that being an established criteria for review by Quality/Risk Management. In any event, uninsured Patient Y was effectively removed from the Baptist Health System ledger.

to fill in for other surgeons as needed on short notice. Gradually, the new Chief of General Surgery completely excluded him from ER call as a condition of Gaskill's suspension. Thus, in December 2011 Gaskill had begun to develop a locum tenens practice in other facilities in Texas.

31.     A locum tenens physician in Texas with the credentials and qualifications of Gaskill can earn from $1,000-$2,000 dollars per day. Working ten to fourteen days a month, in the eighteen-month period from December 7, 2011 when he was initially suspended until the present, Gaskill lost at a minimum of $300,000 based on income at $1,200 per day. His income for that same period based on $2,000 a day would have been $500,000. In addition, Gaskill's expert witness business generated income from both non-trial and trial based work. Calculating his hourly expert fees for non-trial work at $400/per hour with a normal load of twelve hours a week he lost $375,000 in the 18 months he was suspended from the damage done to that aspect of his expert witness business. Trial and deposition fees are $4,000 per day, and Gaskill's business had reached the point where he was in trial or deposition up to three days per month. Calculating that lost income over the 18-month suspension, Gaskill lost another $216,000. The net effect of the Defendants' conduct has been the complete destruction of Gaskill's once thriving medical and expert witness practices.

32.     After 18 months of suspension and in the face of reviewer reports that undermined any belief that Gaskill had ever acted inappropriately, that he ever threatened patient safety, or that the quality of care at North Central Baptist Hospital had ever been in jeopardy because of him, Defendants issued a letter on June 1, 2103 indicating that:

17

"The Medical Executive Board met on May 28, 2013 and determined that your medical privileges should be restored. My letter, dated June 1, 2012 is hereby rescinded. Your full privileges are restored and your record will reflect such status for all inquiries."

There had never been any legitimate basis for Defendants' actions in suspending and thereafter threatening Gaskill with the permanent loss of his privileges. In virtually every respect, Defendants failed to meet the objective threshold requirements of the HCQIA of 1986. There are three areas where peer-review must meet certain objective standards: (1) acting in the reasonable objective belief that the actions taken were in the furtherance of quality health care; (2) after a reasonable effort to obtain the facts; and (3) after adequate notice hearing procedures were afforded to the physician involved or after and such other procedures as are fair to the physician under the circumstances. In all three areas the peer-review process as to Dr. Gaskill completely failed the objective standard to which hospitals and individual persons/physicians are held.in at least the following respects:

**-Acting in the Reasonable Objective Belief that the Actions Taken were in Furtherance of Quality Health Care:** Defendants failed in at least the following respects:

a.      The summary suspension of Dr. Gaskill's admitting, consulting, and operating privileges from December 7, 2011 to June 3, 2013 was not based on a reasonable belief that the action was in furtherance of quality health care because the ongoing review of fifty of Gaskill's surgical cases initiated in July of 2010 was not timely. There is no evidence that as of December 7, 2011 any of Gaskill's surgical cases had been subject to ongoing review. This fact is contrary to the purpose and objectives of ongoing review

18

with respect to furtherance of quality health care.

b.      The summary suspension of Dr. Gaskill's admitting, consulting, and operating privileges from December 7, 2011 to June 3, 2013 was not based on a reasonable belief that the action was in furtherance of quality health care because none of Gaskill's surgical cases performed between July of 2010 and December 7, 2011 were the subject of consideration by the North Central Baptist Hospital Medical Staff Quality/Peer-review Committee for any reason during that time.   Thus, none Gaskill's surgical cases fell out for review based on existing screening criteria applied to all surgical cases.

c.      The summary suspension of Dr. Gaskill's admitting, consulting, and operating privileges from December 7, 2011 to June 3, 2013 was not based on a reasonable belief that the action was in furtherance of quality health care because, although the letter from the North Central Baptist Hospital Medical Staff Quality/Peer-review Committee includes the following statement: "On January 5th, February 2nd, and March 1st, 2012, the Committee met to review your cases.   Of the 44 cases, four cases were deemed to not have met current standards of care." there were absolutely no quality of care issues to even consider in two of the four patients cited.   These two patients were admitted to the hospital under the care of other physicians.   Based on those physicians' history, physical examination, and review of the laboratory data it was the opinion of those physicians that the patients would require surgical consultation.   Accordingly, they consulted Gaskill. Based on Gaskill's history, physical examination, and review of the laboratory data he agreed.   Gaskill operated on both of these patients without any incident whatsoever.   The patients proceeded to recover as expected and were discharged from the hospital days

19

later free of the symptoms for which Gaskill was initially consulted. The outcome in these patients was ideal and any expectation that the quality of their health care could be furthered in any way by summarily suspending Gaskill's privileges is not supportable.

d.      The summary suspension of Dr. Gaskill's admitting, consulting, and operating privileges from December 7, 2011 to June 3, 2013 was not based on a reasonable belief that the action was in furtherance of quality health care because the issue central to these proceedings is whether or not and Gaskill met "the standard of care" in these patients. The standard of care is defined as doing what a reasonable and prudent surgeon would do in the same or similar circumstances. Clearly, in proceedings such as the so-called "peer-review" of Gaskill there may be some differences of opinion among peers about exactly what a reasonable and prudent surgeon would do in the same or similar circumstances. There may also be some differences of opinion about the clinical significance of any deviations from the standard of care. The peer-review of Gaskill's cases provided by Baptist Health System's retained reviewer includes reporting four possible assessments related to standard of care 1) Standard of care met, 2) Minor deviation from the standard of care, 3) Deviation from the standard of care, and 4) Significant deviation from standard of care. In proceedings such as this there are typically some differences of opinion between the peer-review retained by the hospital system and the peer-reviewed retained by the surgeon who has been accused of deviating from the standard of care. Surgeons are not perfect and surgery is not an exact science so typically, there will be one or two cases where both reviewers agree that there was some deviation from the standard of care. In order for there to be a bona fide appeal by the surgeon there must ultimately

20

be some difference of opinion between the reviewer retained by the hospital system and the reviewer retained by the surgeon with respect to the degree and significance of any deviations from the standard of care and whether or not these deviations support a suspension of privileges.

e.      To refute the contention that there were any quality of care concerns it was unnecessary for Dr. Gaskill to retain an independent peer-review.  The hospital system's own retained peer-reviewer found absolutely no deviations from the standard of care in any of the cases the hospital system relied upon to justify the summary suspension of his admitting, consulting, and operating privileges from December 7, 2011 to June 3, 2013. At the various places on his review sheet the reviewer stated either: "There were no significant deviations from the standard of care"… "There were no deviations from the standard of care"…. "There were no minor deviations from the standard of care." In the opinion of the hospital system's own retained peer-review, Dr. Gaskill met the standard of care in every single patient.

f.      In summary, the hospital system's initial assertion that the quality of care provided by Dr. Gaskill to his patient's supported the summary suspension of his admitting, consulting, and operating privileges from December 7, 2011 June 3, 2013 was 100% wrong, 100% of the time, in 100% of the patient's reviewed according to the hospital system's own retained peer-review.  It is not possible that the hospital system was truly acting based on a reasonable belief that the action was in furtherance of quality healthcare absent a stunning level of incompetence on the part of the Defendant North Central Baptist Hospital Medical Staff Quality/Peer-review Committee, the North Central Baptist

Hospital Medical Executive Committee, the Baptist Health System Medical Executive Board, and the Baptist Health System Administration.

**Reasonable Effort to Obtain the Facts:**  Defendants failed in at least the following respects:

a.    The effort by the Defendants to obtain the facts of the matter was not reasonable because, based on all of the information provided to Dr. Gaskill to date by the defendants, the so-called peer-review work product supporting the summary suspension of Gaskill's admitting, consulting, and operating privileges from December 7, 2011 to June 3, 2013 was not begun until January 5, 2012 and not completed until March 1, 2012.  This far exceeds the 14-day period allowed by 42 U.S.C.A. § 11112.

b.  The effort by the Defendants to obtain the facts of the matter was not reasonable because, based on all of the information provided to Dr. Gaskill to date by the defendants, the so-called peer-review work product forming the basis of the summary suspension of Gaskill's admitting, consulting, and operating privileges from December 7, 2011 to June 3, 2013 was not timely to support a claim of "where the failure to take such an action may result in an imminent danger to the health of any individual." as stated in 42 U.S.C.A. § 11112. The cases reviewed date from February 18, 2010, December 18, 2010, January 19, 2011, June 8, 2011, September 11, 2011, and September 25, 2011.  It is not objectively reasonable to arrive at a conclusion that immediate summary suspension is justified based on care provided by Gaskill months and years prior to the so-called peer-review.

c.    The effort by the Defendants to obtain the facts of the matter was not reasonable

22

because, based on all of the information provided to Dr. Gaskill to date by the Defendants, the so-called peer-review work product forming the basis of the summary suspension of Gaskill's admitting, consulting, and operating privileges from December 7, 2011 to June 3, 2013 was not predicated upon a review of the medical record by a general surgeon peer.

d. The effort by the Defendants to obtain the facts of the matter was not reasonable because, based on all of the information provided to Dr. Gaskill to date by the Defendants, the so-called peer-review work product forming the basis of the summary suspension of Gaskill's admitting, consulting, and operating privileges from December 7, 2011 to June 3, 2013 was not predicated upon a review of the medical record by a physician peer licensed to practice medicine and surgery in the State of Texas.

e. The effort by the Defendants to obtain the facts of the matter was not reasonable because, based on all of the information provided to Dr. Gaskill to date by the Defendants, the so-called peer-review work product forming the basis of the summary suspension of Gaskill's admitting, consulting, and operating privileges from December 7, 2011 to June 3, 2013 does not reflect even a rudimentary understanding by the reviewer of the standard of care expected by a general surgeon caring for the same or similar patients.

f. The effort by the Defendants to obtain the facts of the matter was not reasonable because, based on all of the information provided to Dr. Gaskill to date by the Defendants, the so-called peer-review work product forming the basis of the summary suspension of Gaskill's admitting, consulting, and operating privileges from December 7,

23

2011 to June 3, 2013 contains malicious and fraudulent statements not supported by the actual medical record.

g.  The effort by the Defendants to obtain the facts of the matter was not reasonable because, based on all of the information provided to Dr. Gaskill to date by the Defendants, the so-called peer-review work product forming the basis of the summary suspension of Gaskill's admitting, consulting, and operating privileges from December 7, 2011 to June 3, 2013 contains malicious and fraudulent statements in which a critical word was intentionally removed from the pathology report as referenced for the sole purpose of completely changing the meaning of the report and disparaging Gaskill's professional judgment and reputation.

h.  The effort by the Defendants to obtain the facts of the matter was not reasonable because, based on all of the information provided to Dr. Gaskill to date by the Defendants, the so-called peer-review work product forming the basis of the summary suspension of Gaskill's admitting, consulting, and operating privileges from December 7, 2011 to June 3, 2013 was known to be defective by defendant administrators and defendant physicians serving on the defendant medical executive committees and boards. Yet, no corrective action was undertaken despite the ongoing damage to Gaskill's medical practice, professional reputation, and income.

**-After adequate notice hearing procedures were afforded to the physician involved or after and such other procedures as are fair to the physician under the circumstances.**  Defendants failed in the following respects:

a.      Dr. Gaskill was asked to meet with Defendant Mr. Bill Waechter, Chief Executive

24

Officer of North Central Baptist Hospital, Dr. Lee Rodgers, Chief Medical Officer of North Central Baptist Hospital, and Defendant Dr. Jaydeep Shah, Chair of the North Central Baptist Hospital Medical Staff Quality/Peer-review Committee on December 2, 2011. He was informed that there were some concerns about a recent case in which he was the attending of record. It was stated explicitly that the concerns with this case did not warrant suspension of his clinical privileges. At that meeting, Gaskill was explicitly threatened with involuntary suspension of his admitting, consulting, and operating privileges and a report of that fact to the National Practitioners Data Bank if he did not "voluntarily" resign his admitting, consulting, and operating privileges.

b.      The de facto summary suspension of Gaskill's admitting, consulting, and operating privileges constituted a "professional review action" by a "professional review body" within the meaning of the HCQIA.

c.      Prior adequate notice and hearing procedures were not afforded to Gaskill nor were any other procedures afforded that a trier of fact might reasonably consider fair under the circumstances.

d.      Dr. Gaskill subsequently received a letter dated December 7, 2011, which purported to summarize the December 2, 2011 meeting. Based on Gaskill's recollection of the meeting five days earlier this letter contained serious omissions, additions, and misstatements of the facts. Gaskill immediately responded with a rebuttal letter stating his recollection of the facts.

e.      There was a recording device in plain view during the meeting and based on Dr. Gaskill's extensive prior experience with meetings within the Baptist Health System he

25

expected that a recording of the meeting was created.  Gaskill requested a copy of the recording, in writing, on several occasions until he received a letter from Dr. David Siegel, Chief Medical Officer of the Baptist Health System that dated May 8, 2012 stating, "I can confirm for you that there is no audio recording of the meeting that occurred on December 2nd."  Whether a recording was created and ceased to exist after Gaskill requested a copy remains to be discovered.

Based on the above, the BHS process at North Central Baptist Hospital was the textbook definition of a bad faith peer-review, and Defendants enjoy no qualified immunity from suit for monetary damages.

**IV. First Cause of Action: Breach of Contract Against VHS, BHS and CBH**

Plaintiffs hereby incorporate paragraphs 1-32 as if fully set out herein under and in addition would plead as follows:

33.    Gaskill worked for Defendant BHS under a written appointment of privileges that formed the basis of an employment agreement with BHS and North Central Baptist Hospital.  The appointment subjected both Gaskill and BHS to the terms and conditions of the by-laws of the hospital as well as the policies and procedures governing the conduct of physicians, including any disciplinary matters.  The appointment and other documents contained all of the essential elements of Gaskill's employment and was acknowledged and agreed to by both parties.  Gaskill's appointment was in full force and effect on December 7, 2011 when he was suspended.

34.    Defendants' actions whereby they improperly suspended Gaskill and withdrew his credentialing as provided under his contract were a breach of that

26

agreement.

35.    As a direct and proximate result of Defendant BHS's breach, Gaskill and Plaintiff PA suffered lost income from all sources in the amount of $891,000 from December 8, 2011 to the present.  In addition, Defendant BHS's breach resulted in the destruction of Gaskill's medical and expert witness practices.  He could not see any new patients, could not take on new locum tenens assignments, nor provide expert witness services because his credentials had been compromised. Gaskill was sixty years old at the time of his suspension and had a realistic expectancy to continue working both as a locum tenens surgeon through age 72 and an expert witness through age 75.  Based on his earnings, both actual and projected, Defendant's breach cost Gaskill $7,119,000 in total future income from all sources.

36.    In order to prosecute this claim for breach of contract it has been necessary for Plaintiffs to retain the services of the undersigned counsel of record.  Plaintiffs therefore seek the recovery of reasonable and necessary attorneys' fees as provided for in Tex. C. Prac. R. Code §38.001 in an amount to be proven at trial.

### V.  Second Cause of Action: Defamation Against All Defendants

Plaintiffs hereby incorporate paragraphs 1-32 as if fully set out herein under and in addition and/or the alternative would plead as follows:

37.    The elements of a common law claim for defamation are:

(a) The defendant published a statement;

(b) The statement was defamatory concerning the plaintiff;

(c) The defendant acted with

(i) actual malice, if the plaintiff was a public official or public figure, or

(ii) negligence, if the plaintiff was a private individual, regarding the

truth of the statement.

38.    The original suspension was supposedly confidential and not public. However, because the suspension worked to prohibit Gaskill from performing surgical procedures on any patient, he was ethically compelled to tell his existing patients and locum tenens facilities as well as any potential patients and locum tenens facilities that his privileges were suspended and that he was barred from performing surgery. Defendants' actions therefore created the impression that he was incompetent or had somehow done something wrong in connection with his medical practice. By imposing the suspension, all Defendants in effect made the statement that Gaskill lacked competence and was a danger to patients, and any average reasonable person in the general public would construe the suspension in that way. Such statement was never true, and Defendants knew or should have known that it was false.

39.    Gaskill is not a public figure for any purpose, and therefore Defendants are liable for defamation for negligently making the defamatory comments. The statement was libel per se in that it injured Gaskill's and PA's reputation and exposed him and PA to financial injury.

40.    The defamatory comments have damaged Gaskill's reputation beyond the loss of his surgical practice. By virtue of Defendant's actions, after June 1, 2012 Plaintiff's ability to serve as a testifying medical expert has been damaged because 1) he must be credentialed in order to serve as an expert, and 2) the credibility of his opinions

28

has been undermined by a suspension and peer-review action that should never have been instituted and was allowed to go on for over 18 months. Clients are now unwilling to retain him for expert services because in a contested matter his opinions are now subject to impeachment based upon disciplinary action – albeit false action by Defendants that had no basis in fact and never should have occurred.

41.    Gaskill knows that the real reason he was suspended and thereafter threatened with formal revocation is that his business model made his continued presence with the hospital unprofitable for Defendant BHS.  Defendants' actions have damaged Gaskill in the amount of at least $891,000 in lost income over the last eighteen months. As set out in paragraph 27 herein above he has lost future income of $7,119,000 for which he prays relief be granted.  Gaskill has suffered severe and on-going mental anguish and emotional distress as a result of Defendants' actions. Because Defendants actions were taken with malice and motivated by personal and/or economic concerns, Gaskill seeks exemplary damages to the extent allowed by Texas law.

## VI.  Third Cause of Action: Business Disparagement Against All Defendants

Plaintiffs hereby incorporates paragraphs 1-32 as if fully set out herein under and in addition and/or the alternative would plead as follows:

42.    The elements of a business disparagement claim in Texas are:

(a)    The Defendant published disparaging words about the Plaintiff's economic interests;

(b)    The words were false;

(c)    The Defendant published the words with malice;

(d)   The Defendant published the words without privilege;

(e)   The publication caused special damages.

43.   There is no question that the Defendant published the words about the Plaintiff Gaskill and those words directly impact Plaintiff.  PA is the legal entity Gaskill uses to conduct his practice.  Its reputation, activities, and income are inextricably intertwined with Gaskill's reputation, and therefore any actions related to Gaskill, his medical and expert witness practices directly affect the PA in the same way they affect Gaskill.  The words about Gaskill and therefore the PA, in this case the suspension and the innuendo that followed, were blatantly false.  As set out herein above, any protection afforded Defendants by the HCQIA does not exist because Defendants failed in virtually every respect to conduct themselves in a manner that would have afforded them immunity.  The publication has in fact caused PA special damages in that aside from the direct pecuniary loss of past income, the publication by Defendants has destroyed its business and caused a direct future pecuniary loss.  In addition, Plaintiff PA seeks the recovery of exemplary damages as provided and allowed by Texas law.

### VII.  Fourth Cause of Action: Intentional Infliction of Emotional Distress as to All Defendants

Plaintiff hereby incorporates paragraphs 1-32 as if fully set out herein under and in addition and/or the alternative would plead as follows:

44.   The elements of intentional infliction of emotional distress are:

(a)   The plaintiff is a person;

(b)   The defendant acted intentionally or recklessly;

(c)     The emotional distress suffered by the plaintiff was severe;

(d)     The defendant's conduct was extreme and outrageous;

(e)     The defendant's conduct proximately caused the plaintiff's emotional

distress;

(f)     No alternative cause of action would provide a remedy for the severe

emotional distress caused by the defendant's conduct.

45.    Plaintiff Gaskill is clearly a person, and Defendants clearly acted intentionally and/or recklessly.  Gaskill has suffered severe emotional distress in the form of anxiety, depression, and sleeplessness, which can be documented. Gaskill's depression forced him to seek professional help and resulted in a diagnosis of clinically significant depression requiring prescription antidepressant medication for treatment. The act of suspending his privileges with no basis whatsoever and thereby completely cutting off any income was both extreme and outrageous.  Defendants' conduct evidenced by the suspension was the direct and sole cause of Gaskill's emotional distress.  Texas severely limits punitive damages and the ability to recover for emotional distress and to the extent the Court finds that damages for emotional distress cannot be recovered under any other theory pled by Gaskill; he seeks the recovery of those damages under this theory.

46.    Gaskill's damages for emotional distress are at least $7,119,000 in lost earning capacity, and he seeks exemplary damages as well as pre and post judgment interest and costs of court.

## VIII.  Jury Demand

Pursuant to Rule 38 of the Federal Rules of Civil Procedure Plaintiff requests trial

31

by jury of all such issues so triable.

WHEREFORE PREMISES CONSIDERED, Plaintiffs pray that Defendants be cited to appear and answer herein and that upon trial on the merits that Plaintiffs be awarded Judgment as prayed for herein above.   Plaintiffs further pray that they be awarded any and all other relief whether at law or in equity to which they are otherwise entitled.

Dated: July 23. 2013                                    Respectfully Submitted,

/S/ MARK WEITZ
Mark A. Weitz
SB# 21116500
Weitz Morgan PLLC
100 Congress Avenue, Suite 2000
Austin, Texas 78701
mweitz@weitzmorgan.com
512-394-8950 (direct)
512-657-1849 (mobile)
512-852-4446 (facsimile)

ATTORNEY FOR PLAINTIFF